**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF GUAM**

| | |
|---|---|
| **MATAO "EDDIE" YOKENO**, | Civil Case No. 09-00020 |
| Plaintiff, | |
| vs. | **ORDER AND OPINION RE: MOTION FOR SUMMARY JUDGMENT** |
| **SAWAKO SEKIGUCHI,** *a/k/a* **SAWAKO S. LAI, EMIL LAI,** and **JOHN DOES 1-10,** | |
| Defendants. | |

Before the court is a Motion for Summary Judgment ("the Motion") filed by Defendants Sawako Sekiguchi and Emil Lai (collectively, "Defendants"). After reviewing the parties' filings and the relevant case law and statutes, the court hereby **GRANTS** the Motion and issues the following opinion.[1]

**I.**   **FACTUAL BACKGROUND**

Plaintiff Matao "Eddie" Yokeno ("Yokeno") and Defendant EMIL N. LAI ("Lai") have known each other for many years, having been childhood friends. *See* Docket No. 7, Exh. B ¶ 16. Defendant SAWAKO SEKIGUCHI ("Sekiguchi") is Lai's wife. *See id.*, Exh. B ¶ 36. Yokeno is a resident of Guam. *See id.*, Exh. B ¶ 5. Lai is a British National Overseas citizen, and a full-time resident of Japan. *See* Docket No. 25 at 9. Sekiguchi is a citizen of, and a full-time resident of, Japan. *See id.* at 11.

---

[1] On August 2, 2011, the parties appeared before the court for a hearing on the Motion. However, no oral argument ensued because the parties rested on their briefs.

**A.    Yokeno's Debt to Lai**

Around May of 1995, Lai made a personal loan to Yokeno in the amount of $500,000 ("the 1995 loan"). *See* Docket No. 18 at ¶ 3. Interest was set at 10% *per annum*. *See id.* The purpose of the loan was to provide working capital for Yokeno's various business ventures, including the Santa Fe Corporation, which is owned or controlled by Yokeno. *See id.* Yokeno subsequently defaulted in the repayment of this loan. *See id.* at ¶ 4.

**B.    The Memorandum of Agreement**

On October 19, 1997, Yokeno and Lai entered into a memorandum of understanding ("MOA" or "the MOA"). *See* Docket No. 7, Exh. B at ¶ 10; *see also* Docket No. 18 at 14 (the MOA). Their immediate purpose in entering the MOA was to structure and coordinate a joint purchase-and-development of Fai Fai Beach in Guam.[2] *See* Docket No. 18 at 14. More generally, their purpose in entering the MOA was to create an investment opportunity that Yokeno could extend to Lai, as consideration or an inducement for Lai to forbear from taking legal action against Yokeno on the basis of his default on the 1995 loan. *See* Docket No. 18 at ¶¶ 4, 5.

By the terms of the MOA, Lai was to loan $1 million to "a company newly established for the specific purpose of the purchase of [Fai Fai Beach]." Docket No. 18 at 14. The loan was to be interest-free for 6 months from disbursement; thereafter, it would accrue interest at 10% *per annum*. *Id.* In exchange for the loan and the partial waiver for interest, Lai was to receive "ownership of up to 80% but not below 50%" of the new holding company. *Id.* The holding company was then to obtain a loan of $4.25–4.5 million, to repay Lai and create cash flow. *Id.*

After discussing some contingencies related to obtaining the loan, the MOA then describes "[t]he conditions to transfer back the initial shares" from Lai to Yokeno. Docket No. 18 at 14. There are four such conditions: (1) full repayment of the $1 million loan to the holding company;

---

[2] Fai Fai Beach is "Lot 10116-1, Faefae, Municipality of Dededo, Territory of Guam, Estate Number 52453, Suburban, as said lot is marked and designated on Map Drawing T.A. 73-51, dated January 24, 1975, and recorded on February 3, 1975, in the Department of Land Management, Government of Guam, under Document No. 254012." Docket No. 7, Exh. B at ¶ 18.

(2) full repayment of "the original loan [*i.e.*, the 1995 loan] currently at USD 200,000 + [*sic*] a running interest charge of approximately USD 86,000," with interest to accrue past a certain date; (3) full repayment of the loan "provided initially by Mr. E. Sakuma," along with any interest thereon; and (4) Lai's receipt/retention of 10% of the shares in the holding company, "after all of the liabilities are repaid." *Id.* Finally, the MOA refers to other unspecified "projects" of Yokeno's, and states that "each project must have its own accountability and not be a subject of a cash source to subsidize other projects" because "it is necessary and imperative to retain [the] autonomy" of these projects. *Id.*

### C. Fai Fai Beach Associates

In keeping with the MOA, a holding company called "Fai Fai Beach Associates" ("FFBA") was created on November 5, 1997. *See* Docket No. 7, Exh. B at ¶ 10; *see also* Docket No. 42, Exh. A at 3 (establishing correct date). FFBA filed its articles of incorporation and its bylaws on November 5, 1997. *See* Docket No. 19 at ¶¶ 3.f (articles of incorporation), 3.I (bylaws). FFBA was capitalized in ten thousand shares of common stock with a par value of $1. *See* Docket No. 7, Exh. B at ¶ 11.

Lai subscribed to 8,000 shares of FFBA's stock. Docket No. 7, Exh. B at ¶ 12; *see also* Docket No. 19 at ¶ 3.f (articles of incorporation). Lai has explained why his 80% ownership stake was important to him:

> Because Yokeno was already in default in the repayment of Yokeno's loan debt to me and Yokeno was asking me to make yet another substantial outlay of cash to protect myself, . . . I definitely wanted and did have voting control over the management of that corporation, in the event that I decided to actually exercise control as the 80% stockholder of that corporation.

Docket No. 18 at ¶ 7.

The other 2,000 shares of FFBA stock went to Steffen Niu and Andrew Porter, who each subscribed to 1,000 shares. *See* Docket No. 19 at ¶ 3.f . The parties appear to agree that Niu and Porter collectively held these 2,000 shares in trust for, or as nominees of, Yokeno. *See* Docket No. 7, Exh. B at ¶ 12; Docket No. 16 at 11; Docket No. 46 at 9.

On November 14, 1997, FFBA acquired the title to Fai Fai Beach. *See* Docket No. 19 at ¶ 3.b. Since then, the fair market value of that property is alleged to have gone up. *See* Docket No. 7, Exh. B at ¶ 19. FFBA still holds the title to Fai Fai Beach. *See id.* at ¶ 20; *see also* Docket No. 16 at 2.

**D.** **Powder Sand, Incorporated**

By 2003, Yokeno still had not repaid his debt to Lai. *See* Docket No. 18 at ¶ 13. At some point during the year, Yokeno suggested that Lai have Shigen Kaihatsu Sha Pte. Ltd. ("SKS")—a Singapore corporation that Lai holds shares of—invest in a new corporation, to be created under the laws of Guam, that would operate an eco-tourism business on Fai Fai Beach. *See id.* This new corporation was to be called Powder Sand, Inc. ("PSI"). *Id.* Lai and Yokeno believed that the creation and operations of PSI would improve the marketability, development, and sale of Fai Fai Beach—which would, in turn, enable Yokeno to repay his debt to Lai and allow Lai to realize a profitable return on his investment in FFBA. *See id.* at ¶ 14.

PSI was formed on April 21, 2003. *See* Docket No. 19 at ¶¶ 3.kk (articles of incorporation), 3.ll (bylaws). SKS is on record as the initial owner of 997 of the 1,000 shares of stock issued by PSI. *See id.* at ¶ 3.kk. On May 12, 2006, SKS transferred legal title to one share of PSI to Lai, one share to Sekiguchi, and one share to a Masaaki Hamamoto. *See id.* at ¶¶ 3.pp, 3.qq, 3.rr. In each case, SKS provided that it shall remain the beneficial owner of the particular share of capital stock. *See id.*

**E.** **Reaffirmation of the Memorandum of Agreement**

In December of 2004, Lai and Yokeno exchanged some emails in which they discussed their plans for FFBA. *See* Docket No. 19 at ¶ 3.a. On December 27, 2004, Lai wrote that they "should straighten out some basic understanding [*sic*]." *Id.* In that vein, Lai made six points. *See id.* Only three of those points are important here. The first point reads:

> 1) The ownership of the land is with Fai Fai Beach Associates (80% owned by Emil Lai) and there is no problem with the other minority stakeholders. In the event of the sale of the entire premise and operation, you will take care of the minority interests from your share of the profits. You will also negotiate Mr. Sakuma's debt on your own, if necessary.

*Id.* The third point reads: "3) My investments plus the running rate to date (appx. USD 2.4 mln–accurate details to be furnished) will be repaid in an accelerated manner before you take any dividends." *Id.* And the sixth point reads: "6) When my initial investments are fully repaid, will split all proceeds from the income generated minus any necessary capital refurbishment costs which will include, when applicable, even the sale of the entire land and venture." *Id.* Finally, Lai asked that "[i]f you feel the above is appropriate, *please acknowledge*." *Id.* (emphasis added).

On December 28, 2004, Yokeno responded to Lai's email from the previous day. *See* Docket No. 19 at ¶ 3.a. He wrote that Lai's email was "*well taken and acknowledged.*" *Id.* (emphasis added). Yokeno then went on to write:

> However, one point. Why don't we repay ourselves proportional to the equity we have in the property. [*sic*] I have $1 million, and whereas for your case will [*sic*] be approximately $2.4million [*sic*] ($1 mln for the property and other loans) as you have calculated. I guess this will be equitable for both of us."

*Id.*

## F. The CSB Note, and Lai's Acquisition Thereof

On or about December 23, 1998, Yokeno executed a personal guaranty ("the guaranty") in favor of Citizens Security Bank ("CSB"), guaranteeing the payment at maturity of a certain promissory note in the amount of $2.4 million ("the Note"). *See* Docket No. 7, Exh. B at ¶ 25. The Note was made to CSB by the Santa Fe Corporation, which, again, Yokeno controls. *Id.* at ¶ 26. On or about July 27, 2001, the Santa Fe Corporation filed for bankruptcy, defaulting on the Note and making Yokeno individually and personally liable under the guaranty. *Id.* at ¶ 28. This liability extended to Yokeno's business and real property interests. *Id.* at ¶ 31.

In December of 2002, in the Superior Court of Guam, CSB moved to summarily enforce Yokeno's payment obligation under the guaranty. *See* Docket No. 7, Exh. B at ¶ 29. Yokeno did not oppose this motion. *See* Docket No. 19 at ¶ 6. The Superior Court of Guam granted this motion on February 27, 2004. *See* Docket No. 7, Exh. B at ¶ 29. The Superior Court of Guam entered judgment ("the CSB judgment") against Yokeno on January 23, 2008, for $2,497,369.93 in

1    damages, plus interest and costs of suit.  *See* Docket No. 19 at ¶ 6.  On January 30, 2008, the CSB
2    judgment was entered on the docket, and written notice thereof was mailed by the clerk of court to
3    all counsel of record.  *See* Docket No. 19 at ¶ 7.  Yokeno did not appeal the CSB judgment, and did
4    not undertake any legal process to stay its execution.  *See* Docket No. 16 at 2.

5           Meanwhile, Lai believed that Yokeno was misleading him with regard to the risk status of
6    his investments in FFBA and PSI (via SKS).  *See* Docket No. 18 at ¶ 20.  Thus, Lai decided to
7    conduct his own independent investigation into the status of his investments.  *See id*.  He began this
8    investigation in March of 2006.  *See id*. at ¶ 20.

9           On March 25, 2006, Lai discovered that FFBA's only asset—namely, Fai Fai Beach—had
10   been sold and conveyed to the Government of Guam on March 11, 2005 for the non-payment of real
11   property taxes, and that FFBA owed the Government of Guam delinquent real property taxes
12   totaling approximately $98,712.54, plus redemption penalties totaling approximately $20,000.  *See*
13   Docket No. 18 at ¶ 22.

14          On March 25, 2006, Lai also discovered that Yokeno had submitted, and signed as president,
15   the 2004 Annual Report for PSI.  *See* Docket No. 18 at ¶ 24; *see also id*. at 15-17 (report).  Lai then
16   promptly demanded and noticed special meetings of the stockholders of FFBA and PSI to remove
17   the existing directors and officers and elect new ones, which were successful.  *See* Docket No. 18
18   at ¶ 26; *see also* Docket No. 19 at ¶¶ 3.k-3.t (FFBA items), 3.mm-3.uu (PSI items).

19          On May 14, 2008, Lai gave notice that he was the assignee of the CSB judgment.  *See*
20   Docket No. 19 at ¶ 8.  Various writs of execution issued, and Lai sought to have the CSB judgment
21   satisfied.  *See* Docket No. 18 at ¶ 34; Docket No. 19 at ¶ 9.  The Marshal's execution sale was held
22   on July 11, 2008.  *See* Docket No. 19 at ¶ 12.  At the sale, Lai acquired all rights, title, and interests
23   that Yokeno may have had in FFBA, as well as all rights, title, and interests that Yokeno may have
24   had in PSI.  *See id*.  However, the Marshal's execution sale did not fully satisfy the CSB judgment.
25   *See* Docket No. 19 at ¶ 9 (*alias* writs).
26

## II.     RELEVANT PROCEDURAL BACKGROUND

On March 11, 2009, this case commenced in the Superior Court of Guam.  *See* Docket No. 7, Exh. B.  On July 30, 2009, Defendants Lai and Sekiguchi removed it to this court.  *See* Docket No. 1; *see also* Docket No. 7 (amended notice of removal).

On August 18, 2009, Defendants filed their "Motion of Defendants for Summary Judgment" ("the Motion").  *See* Docket No. 16; *see also* Docket Nos. 17 and 18 (supporting declarations).  That same day, Attorney Rawlen M.T. Mantanona moved for leave to withdraw as attorney for Plaintiff Yokeno.  *See* Docket No. 13; *see also* Docket Nos. 14 (supporting memorandum) and 15 (supporting declaration).  The court granted Attorney Mantanona's motion on August 27, 2009.  *See* Docket No. 22.

On October 1, 2009, Yokeno—appearing *pro se*—filed an opposition to the Motion.  *See* Docket No. 39.

On October 8, 2009, Defendants replied to Yokeno's opposition.  *See* Docket No. 41; *see also* Docket No. 44 (supporting declaration).  They filed a corrected version of their reply on October 13, 2009.  *See* Docket No. 46.

On February 25, 2010, the court ordered supplemental briefing on some issues relevant to deciding the Motion.  *See* Docket No. 54.  On March 11, 2010, Defendants filed their supplemental brief.  *See* Docket No. 55; *see also* Docket Nos. 56-61 (supporting materials).  On March 25, 2010, Yokeno filed his supplemental brief, though without an original signature.  *See* Docket No. 63; *see also* Docket No. 64 (supporting declaration, also without original signature).  On March 30, 2010, Yokeno filed his supplemental brief with an original signature.  *See* Docket No. 66.  On April 1, 2010, Defendants replied to Yokeno's supplemental brief.  *See* Docket No. 67.

The parties appeared before the court on April 26, 2010 for a hearing on the Motion.  Docket No. 69.  Yokeno orally moved to continue the hearing, and after hearing arguments from the parties, the court granted the motion to continue.  *Id.*

On May 17, 2010, the date of the continued hearing on the Motion, Yokeno filed an Entry

of Appearance of Teker Torres & Teker P.C. as the attorneys of record for Yokeno. *See* Docket No. 70. That same day, Yokeno also filed a Motion for Continuance Pursuant to Federal Rule of Civil Procedure 56(f)[3] ("the Rule 56(f) Motion"). *See* Docket No. 71. At the hearing, the court granted the untimely Rule 56(f) Motion to allow Yokeno to depose Lai and Sekiguchi. *See* Docket No. 74.

Yokeno deposed Lai on May 26, 2010. *See* Docket No. 76. Then, on November 12, 2010, Yokeno deposed Sekiguchi. *See* Docket No. 101.

Thereafter, the court ordered Yokeno to file a supplemental brief delineating specific parts of the deposition transcripts that support his opposition to the Motion. *See* Docket No. 108. Yokeno filed his supplemental brief on January 21, 2011, and Defendants filed a reply on January 28, 2011. *See* Docket Nos. 117, 124.

Before filing the supplemental brief, Yokeno filed a Motion for Imposition of Sanctions; to Compel Deposition; and to Deny Defendant's Motion for Summary Judgment *Ab Initio*. *See* Docket No. 113. However, on February 22, 2011, Yokeno withdrew his motion. *See* Docket Nos. 127, 131.

On April 12, 2011, Yokeno filed an Amended Motion for Imposition of Sanctions; to Compel Deposition; and to Deny Defendant's Motion for Summary Judgment *Ab Initio* ("Amended Motion"). *See* Docket No. 134. On June 2, 2011, Magistrate Judge Manibusan heard Yokeno's Amended Motion and granted the Motion to Compel Deposition, but denied the Motion for Sanctions ("the Magistrate's Order"). *See* Docket No. 151.

On June 12, 2011, Defendants filed Objections to the Magistrate's Order ("the Objections"). *See* Docket No. 156. Then on June 16, 2011, Defendants filed a Motion for Reconsideration of Chief Judge's Order Granting Plaintiff's Rule 56(f) Motion ("the Motion for Reconsideration"). *See* Docket No. 158. Yokeno responded to the Objections and the Motion for Reconsideration on June 27 and June 30, 2011, respectively. *See* Docket Nos. 160, 162. Defendants replied to the opposition to the Motion for Reconsideration on July 4, 2011. *See* Docket No. 163.

---

[3] The Federal Rules of Civil Procedure have since been amended, and the substance of Rule 56(f) is now embodied by Rule 56(d). *See* FED. R. CIV. P. 56.

On July 26, 2011, the court heard the Objections and the Motion for Reconsideration. *See* Docket No. 165. The court granted the Motion for Reconsideration, and accordingly, struck the Defendants' depositions and all related documents from the record. *See* Dkt. No. 166.

On August 1, 2011, Yokeno filed an "Objection" to the court's order granting the July 26 order. *See* Dkt. No. 167. At the hearing on the Motion, the court overruled the Objection.[4] *See* Dkt. No. 168.

## III.    JURISDICTION AND VENUE

All of Plaintiff's causes of action are within the court's diversity jurisdiction, or within its supplemental jurisdiction over related state law claims. *See* 28 U.S.C. § 1332, 1367(a); *see also* Docket No. 7 at ¶ 1.

Venue is proper in this judicial district, the District of Guam, because Defendants conduct business here, and because all of the events or omissions giving rise to Plaintiff's claims occurred here. *See* 28 U.S.C. § 1391.

## IV.    APPLICABLE STANDARDS

The court is sitting in diversity, so it applies Guam substantive law but federal procedural law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 426-28 (1996). Thus, federal standards determine whether the evidence is sufficient to raise a question for the trier-of-fact. *See Gasaway v. Nw. Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that a material fact cannot be genuinely disputed, the movant may:

> (A)    cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

---

[4] The court has reviewed the Lai and Sekiguchi deposition transcripts as well as the Yokeno's corresponding supplemental brief. Neither the deposition transcripts nor the supplemental brief support Yokeno's breach of fiduciary duty claims, and the supplemental brief raises issues that are beyond the scope of the claims asserted in the Complaint. Thus, the court finds that even if it were to consider the stricken materials in its analysis of the Motion, it would not change the outcome of the decision.

admissions, interrogatory answers, or other materials; or

(B)    show[] that the materials cited do not establish the . . . presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).

A fact is material if it might affect the outcome of the suit under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, the evidence presented in opposition to summary judgment must be "enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Servs. Co.*, 391 U.S. 253, 288-89 (1968)). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

In particular, no "genuine issue" may be found "where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)).

The opposing party's evidence must be sufficient to create a genuine issue of fact that is material to the outcome of the suit, *whether or not it has the burden of proof at trial. See McCabe v. Gen. Foods Corp.*, 811 F.2d 1336, 1340 (9th Cir. 1987). Thus, "[w]hen the moving party has carried its burden . . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

//

//

//

## V. ANALYSIS

All of Yokeno's claims depend on a finding that Lai owed a fiduciary duty to Yokeno, and that he violated that duty.[5]  As such, it makes sense to begin the analysis of the Motion by asking whether Yokeno can prove that Lai owed him a fiduciary duty, and, if so, whether Lai violated that fiduciary duty.

### A.  Yokeno May Be Able To Prove That Lai Owed Him A Fiduciary Duty

Yokeno has three theories of Lai's alleged fiduciary duty: (1) Lai was his partner; (2) Lai was his trustee, insofar as Lai allegedly held shares of stock in trust for him; and (3) Yokeno was a minority shareholder in a corporation in which Lai was a majority shareholder.  *See, e.g.*, Docket No. 7, Exh. B, at ¶¶ 33-35.

#### 1.  *Lai was not Yokeno's "partner"*

As to theory (1), Lai has indicated the absence of evidence indicating that any partnership existed between Lai and Yokeno.  *See* Docket No. 16 at 4; *see* Docket No. 18 at ¶ 18.

Although Yokeno repeatedly asserts that he and Lai were in a partnership—*see, e.g.*, Docket No. 39 at 4—the only evidence he offers in support of this assertion is in the "Declaration of Matao

---

[5] *See, e.g.*, Docket No. 7, Exh. B at ¶¶ 55 (First Cause of Action, styled "Breach of Fiduciary Duty"), 59 (Second Cause of Action, styled "Participation in and/or Aiding and Abetting Breach of Fiduciary Duty"), 68 (Third Cause of Action, also styled "Participation in and/or Aiding and Abetting Breach of Fiduciary Duty"), 82 (Fourth Cause of Action, styled "Fraud"; duty not to conceal stems from alleged fiduciary relationship, which duty cannot have been violated if no breach of fiduciary duty); 87-88 (Fifth Cause of Action, styled "Conspiracy to Defraud"; depends on fraudulent nature of Fourth Cause of Action, which, again, depends on some fiduciary relationship); 96-97 (Sixth Cause of Action, styled "Constructive Trust"; depends on allegation that Defendants "wrongfully, maliciously and calculatedly dispossessed and deprived" Yokeno of property, which can be legally true here only if certain fiduciary duties existed); 103 (Seventh Cause of Action, styled "Conversion"; depends on allegation of "violation of fiduciary duties"); 107 (Eighth Cause of Action, also styled "Conversion"; also depends on allegation of "violation of fiduciary duties"); and 111-112 (Ninth Cause of Action, styled "Intentional Infliction of Emotional Distress"; duty to obtain "knowledge and consent" stems from alleged fiduciary relationship, which duty cannot have been violated if no breach of fiduciary duty).

In regard to ¶ 82, *see also* 59A AM. JUR. 2D *Partnership* § 395 (stating that "the fiduciary duties of partners of much broader than the narrow range of conduct encompassed by the essential elements of fraud . . . ."); and in regard to ¶¶ 96-97 *see also Guam Bar Ethics Committee v. Maquera*, 2001 Guam 20 at ¶¶ 30-31 (indicating that constructive trust claim depends on "violation of a duty to the plaintiff to whom [the defendant] is in a fiduciary relation").

Yokeno," and the supporting exhibits attached thereto. *See* Docket No. 39 at 7-14. The declaration offers only conclusory statements of partner status. *See* Docket No. 39 at 7-9. This is only "uncorroborated and self-serving testimony," and so cannot create a "genuine issue" sufficient to defeat a motion for summary judgment. *Villiarimo*, 281 F.3d at 1061. Likewise, the supporting exhibits offer no evidence of a partnership. *See* Docket No. 39 at 10-14.

As to theory (1), then, there is no "evidence on which the jury could reasonably find for [Yokeno]" on this point. *Liberty Lobby*, 477 U.S. at 252. Yokeno cannot prove that he and Lai were in a partnership.[6]

### 2. *Lai was not Yokeno's trustee*

As to theory (2), Lai has also indicated the absence of evidence supporting Yokeno's allegation of a trust agreement. *See* Docket No. 16 at 15; *see also* Docket No. 18 at ¶¶ 17, 43. Lai also argues that the December 2004 email exchange between Lai and Yokeno is positive evidence that no such trust agreement existed. *See* Docket No. 16 at 12-14.

Yokeno offers no evidence whatsoever in opposition. *See generally* Docket Nos. 39, 117. Yokeno insists that the court must "assume that a stock agreement was in place" because he is the nonmovant. *See* Docket No. 117 at 7:7–9. However, like theory (1), Yokeno only offers self-serving, conclusory statements of the existence of a trust agreement that the court need not construe as true. *See id.* at 5:15–7:19.

Thus, as to theory (2), there is no "evidence on which the jury could reasonably find for

---

[6] Even if Yokeno could prove that he and Lai were in a partnership, Lai would owe Yokeno essentially the same fiduciary duties that he owes on the majority-shareholder-in-close-corporation theory. *See* discussion *infra* at 17:9–19:8; *see also* 68 C.J.S. *Partnership* § 167 ("Partners can sue each other at law on claims growing out of transactions which are not connected with the partnership business.") (citing *Linch v. Linch*, 18 N.W.2d 98 (Neb. 1945); *Birkemeier v. Orino*, 123 P.2d 185 (Or. 1942)); 59A AM. JUR. 2D *Partnership* § 375 ("An action on a promissory note given by a partner to his or her copartner for a personal indebtedness may be maintained at law without satisfying the usual requirement for a prior accounting, since the note constitutes an acknowledgment of a separate debt, segregated by the parties from partnership affairs. This rule applies to actions between partners for money loaned . . . ."). And as under that theory, Yokeno's breach of fiduciary duty claim would fail.

1    [Yokeno]" on this point. *Liberty Lobby*, 477 U.S. at 252. Yokeno cannot prove that Lai was his

2    trustee in any capacity.

3        **3.     *Yokeno as minority shareholder in corporation in which Lai was majority***

4              ***shareholder***

5        As to theory (3), there are two corporations at issue: PSI and FFBA.

6        Theory (3) appears based on a presumption that, under Guam law, "a controlling shareholder

7    [in a close corporation] owes a fiduciary duty to minority shareholders." 12B WILLIAM MEADE

8    FLETCHER, FLETCHER'S CYCLOPEDIA OF THE LAW OF CORPORATIONS (hereinafter "FLETCHER'S

9    CYCLOPEDIA") § 5811.05. Both PSI and FFBA are close corporations under common law, because

10   they both have "(1) a small number of shareholders; (2) no ready market for corporate stock; and

11   (3) active shareholder participation in the business." 1A FLETCHER'S CYCLOPEDIA § 70.10. Under

12   these criteria, both PSI and FFBA are close corporations. However, there are no decisions from the

13   Supreme Court of Guam indicating that Guam law actually recognizes the rule imposing fiduciary

14   duties on controlling shareholders in such corporations.

15       "When a decision turns on applicable state law and the state's highest court has not

16   adjudicated the issue, a federal court must make a *reasonable determination* of the result the highest

17   state court would reach if it were deciding the case." *Med. Lab. Mgmt. Consultants v. Am. Broad.*

18   *Cos.*, 306 F.3d 806, 812 (9th Cir. 2002) (emphasis added); *see also Kona Enters., Inc. v. Estate of*

19   *Bishop*, 229 F.3d 877, 885 n. 7 (9th Cir. 2000). To make such a "reasonable determination," the

20   federal court looks to "intermediate appellate court decisions, decisions from other jurisdictions,

21   statutes, treatises, and restatements as guidance." *McCoy v. Chase Manhattan Bank, USA*, 559 F.3d

22   963, 970 (9th Cir. 2009); *see also Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991

23   (9th Cir. 1995). As there are no intermediate appellate courts in Guam, the court looks to decisions

24   from other jurisdictions, statutes, treatises, and the like, giving special weight to decisions from other

25   jurisdictions. *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir.

26   2002) (Posner, J.) ("When state law on a question is unclear . . . , the best guess is that the state's

27   highest court, should it ever be presented with the issues, will line up with the majority of the

states.").

Most state courts have held that a controlling shareholder owes fiduciary duties to minority shareholders, particularly in the close corporation setting. *See*, *e.g.*, *Jones v. H.F. Ahmanson & Co.*, 460 P.2d 464, 470 (Cal. 1969); *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1220-21 (7th Cir. 1995) (applying Illinois law); *Wilkes v. Springside Nursing Home, Inc.*, 353 N.E.2d 657, 663-65 (Mass. 1976); *Gay v. Gay's Super Markets, Inc.*, 343 A.2d 577, 582 (Me. 1975); *Evans v. Blesi*, 345 N.W.2d 775, 780 (Minn. Ct. App. 1984); *Frank Lerner & Assocs., Inc. v. Vassy*, 599 N.E.2d 734, 738 (Ohio Ct. App. 1991); *Zidell v. Zidell*, 560 P.2d 1086, 1089 (Or. 1977); *Ferber v. Am. Lamp Corp.*, 469 A.2d 1046, 1050 (Pa. 1983); *Nelson v. Martin*, 958 S.W.2d 643, 649 (Tenn. 1997); *J Bar H, Inc. v. Johnson*, 822 P.2d 849, 859 (Wyo. 1991). *But see*, *e.g.*, *Redmon v. Griffith*, 202 S.W.3d 225, 237 (Tex. App. 2006) (shareholder in close corporation does not, as a matter of law, owe fiduciary duty to co-shareholder; existence of such a duty depends on circumstances). Given the weight of authority, the court holds that, under Guam law, a controlling shareholder in a close corporation owes fiduciary duties to minority shareholders.

### a. Yokeno was never a legal nor beneficial owner of shares in PSI

As to PSI, the court, in its "Order re: Supplemental Briefing and Hearing," asked the parties whether Yokeno was ever the legal or beneficial owner of shares in PSI, and ordered the parties "*to support their answers accordingly*." Docket No. 54 at 1:24 (emphasis in original). Further, the court advised the parties that its then-understanding "[was] that Yokeno was never the legal owner of shares in . . . PSI," and "was never the beneficial owner of shares in PSI." *Id*. at 2:12-14.

Yokeno has failed to alter that understanding. In his response, Yokeno admitted that he was never "the legal registered owner of shares in PSI." Docket No. 63 at 1. As for beneficial ownership, Yokeno simply stated that Lai held shares of PSI in trust for him. *See id*. at 2 ("Yokeno and Lai formed a similar arrangement in regard to shares of PSI, a corporation formed in April 2003."). For evidentiary support of that statement, Yokeno refers to Paragraph 3 of his own declaration, which reads: "Emil Lai and I were in a business partnership, in which Emil Lai agreed to hold shares of Fai Fai Beach Associates and later, Powder Sand, Inc., in trust for my benefit."

Docket No. 64 at ¶ 3. Once again, this is "uncorroborated and self-serving testimony," and so cannot create a "genuine issue" sufficient to defeat a motion for summary judgment. *Villiarimo*, 281 F.3d at 1061.

Thus, there is no "evidence on which the jury could reasonably find for [Yokeno]" on this point. *Liberty Lobby*, 477 U.S. at 252. Yokeno cannot prove that he was ever the legal or beneficial owner of shares in PSI.

> **b.**  **Yokeno was a beneficial owner of shares in FFBA, and so may qualify as a "shareholder"**

As to FFBA, the parties appear to agree that, at least through Niu and Porter, Yokeno was the beneficial owner of 20% of the shares in FFBA. *See* Docket No. Docket No. 7, Exh. B at ¶ 12; Docket No. 16 at 11; Docket No. 19 at ¶ 3.f; Docket No. 46 at 9; *see also* Docket No. 55 at 2 (Lai's admission that "Yokeno was the beneficial owner of 2,000 shares of capital stock in [FFBA]"). And it is clear that Lai owned the remaining 80% of the shares in FFBA. *See* Docket No. 7, Exh. B at ¶ 12; *see also* Docket No. 19 at ¶ 3.f.

However, even assuming that "majority shareholders in close corporations owe fiduciary duties to minority shareholders," it is not clear that Yokeno can avail himself of this rule. Given that Yokeno was the *beneficial owner* of 2,000 shares of capital stock in FFBA, it does not necessarily follow that he was a "shareholder" in FFBA.

FFBA is governed by the old General Corporation Law of Guam ("GCLG"). *See* Docket Nos. 55 and 63 (agreeing that FFBA is governed by the GCLG). The GCLG defines "shareholder" as the "holder or [*sic*; should probably read "of"] record of shares or shareholder or [*sic*; should probably read "of"] record." 18 Guam Code Ann. § 1102.

In contrast, the Guam Business Corporation Act ("GBCA") defines "shareholder" as "the person in whose name shares are registered in the records of a corporation *or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation.*" *Id.*

§ 28110(s) (emphasis added).[7] That the GBCA includes beneficial owners within its definition of "shareholder," while the GCLG does not, is evidence that beneficial owners of shares in corporations governed by the GCLG are not "shareholders" in those corporations.

However, the GCLG definition is qualified by the phrase "[u]nless the context otherwise requires." 18 GUAM CODE ANN. § 1102. No clues are given about what sort of context might do so, but, in the interests of equity—all of Yokeno's claims are grounded in an alleged breach of fiduciary duty, so they all have an equitable aspect—the court assumes that this case is one such context.

Thus, for purposes of deciding the Motion, the court treats Yokeno as a minority shareholder in FFBA, a corporation in which Lai was majority shareholder.

## B.    Yokeno Cannot Prove That Lai Violated His Fiduciary Duties

The court has held that under Guam law a controlling shareholder in a close corporation owes fiduciary duties to minority shareholders. However, "there is no consensus among the states about the *scope* of the fiduciary duties owed by close corporation shareholders to one another, [even though] the vast majority of state courts have held that heightened duties do exist." Shannon Wells Stevenson, Note, *The Venture Capital Solution to the Problem of Close Corporation Shareholder Fiduciary Duties*, 51 DUKE L.J. 1139, 1147 (2001) (emphasis added) (hereinafter "Stevenson, *Close Corporation Shareholder Fiduciary Duties*"). Thus, despite having held that under Guam law a controlling shareholder in a close corporation owes fiduciary duties to minority shareholders, the court must still make a "reasonable determination" of the scope and content of those duties. *Medical Lab. Mgmt. Consultants*, 306 F.3d at 812.

In the close corporation context, "[t]he scope of the fiduciary duties is flexible, reflecting the

---

[7] Note that the GBCA even specifies the type of evidence needed to support a claim of beneficial share ownership: "a nominee certificate on file with a corporation." 18 GUAM CODE ANN. § 28110(s). Yokeno states that "[he] does not hold any documents or evidence that describes [*sic*] Yokeno as being the formally registered owner of any security or ownership interest in FFBA or PSI." Docket No. 63 at 1. He has adduced no nominee certificates or similar documents. Thus, it is arguable that Yokeno cannot be a "shareholder" under Guam law without such documentation. In that case, all of Yokeno's claims would necessarily fail, as there would be no possible fiduciary relationship.

historical approach of the courts of equity. Any general formulation or even categorization of these duties is difficult and runs the risk of being vague and incomplete." 2 F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL AND THOMPSON'S OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS (hereinafter "O'NEAL AND THOMPSON'S OPPRESSION") § 7:3. Still, it is possible to construct a general formulation of these fiduciary duties by synthesizing the leading cases.

Many authorities recognize that, when it comes to the fiduciary duties owed by controlling shareholders to minority shareholders in close corporations, the leading cases are from Massachusetts.[8] Thus, the court looks to the Massachusetts cases to determine the scope and content of the fiduciary duties that a controlling shareholder in a close corporation owes to minority shareholders under Guam law.

In Massachusetts, "shareholders in a close corporation . . . ow[e] each other a fiduciary duty of the 'utmost good faith and loyalty.'" *O'Brien v. Pearson*, 868 N.E.2d 118, 124 (Mass. 2007) (quoting *Donahue v. Rodd Electrotype Co. of New England, Inc*., 328 N.E.2d 505, 515 (Mass. 1975)). Thus, "[s]tockholders in close corporations . . . may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation."

---

[8] *See, e.g.,* ROBERT HAMILTON, CASES AND MATERIALS ON CORPORATIONS 482 (8th ed. 2003) ("The basic holding of [Massachusetts case] *Donahue* that fiduciary relationships exist within closely held corporations has been widely cited and accepted. Courts in more than 25 states have either cited *Donahue* approvingly or have cited cases that relied upon *Donahue* for this proposition."); SANDRA K. MILLER, LIMITED LIABILITY COMPANIES: A COMMON CORE MODEL OF FIDUCIARY DUTIES § 7:2 (Massachusetts as exemplar of jurisdictions with "judicially developed remed[ies] for breach of fiduciary duty owed by the majority to the minority"); 2 O'NEAL AND THOMPSON'S OPPRESSION § 7:4 (identifying Massachusetts cases as "leading" and discussing them at length); David C. Crago, *Fiduciary Duties and Reasonable Expectations: Cash-Out Mergers in Close Corporations*, 49 OKLA. L. REV. 1, 8-11 (1996) (describing Massachusetts cases as "the point of departure" for the development of fiduciary duties in the close corporation setting, and discussing them at length); Benjamin Means, *A Voice-Based Framework for Evaluating Claims of Minority Shareholder Oppression in the Close Corporations*, 97 GEO. L.J. 1207, 1225 (2009) (identifying Massachusetts as the exemplar of "uncompromising fiduciary duties" owed by controlling shareholders to minority shareholders in close corporations; discussing cases); Stevenson, *Close Corporation Shareholder Fiduciary Duties*, 51 DUKE L.J. at 1146-48 (describing how "Massachusetts initiated the trend toward imposing enhanced fiduciary duties on close corporation shareholders in *Donahue v. Rodd Electrotype Co. of New England*"); Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 BUS. LAW. 699, 726-29 (1993) (discussing the "widespread acceptance" of the Massachusetts cases on close corporation shareholder fiduciary duties).

*Donahue*, 328 N.E.2d at 515. This is "substantially the same fiduciary duty" that partners in a partnership owe each other, and it is higher than a "good faith and inherent fairness" standard. *Id.* at 515-16.

However, these duties are not without limitations, two of which bear sharply on the case at hand. First, these fiduciary duties "gover[n] *only* [shareholder] actions *relative to the operations of the enterprise* and the effects of that operation on the rights and investments of other stockholders." *Donahue*, 328 N.E.2d at 515 n.18 (emphasis added). Thus, they are not free-floating strictures of benevolence; rather, they are duties that attach only to "actions relative to the operations of the enterprise." *Id.*; *see also Southern Pac. Co. v. Bogert*, 250 U.S. 483, 487-88 (1919) ("The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors."); *Ahmanson*, 460 P.2d at 471 ("Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business.").

Second, any claim of breach of fiduciary duty must be evaluated in light of "the [shareholder's] *reasonable expectations of benefit* from their ownership of shares." *Brodie v. Jordan*, 857 N.E.2d 1076, 1079 (Mass. 2006). As such, if the shareholder's expectations were *unreasonable*, then no breach of fiduciary duty can be found. *See, e.g.*, *Merola v. Exergen Corp.*, 668 N.E.2d 351, 353-55 (Mass. 1996) (no breach of fiduciary duty because plaintiff's expectation of continued employment was not reasonable after he sold back his stock and "realized a significant return on his capital investment independent of the salary he received as an employee"); *see also Stefano v. Coppock*, 705 P.2d 443, 446 n.3 (Alaska 1985) (adopting the "reasonable expectations" approach); *Maschmeier v. Southside Press, Ltd.*, 435 N.W.2d 377, 380 (Iowa Ct. App. 1988) (finding that the "alleged oppressive conduct by those in control of a close corporation must be analyzed in terms of 'fiduciary duties' owed by majority shareholders to the minority shareholders and 'reasonable expectations' held by minority shareholders"); *Fox v. 7L Bar Ranch Co.*, 645 P.2d

929, 933-34 (Mont. 1982) (examining various jurisdictions' approaches to defining oppressive and concluding that ultimately "courts must determine the expectations of the shareholders concerning their respective roles in corporate affairs"); *Brenner v. Berkowitz*, 634 A.2d 1019, 1029 (N.J. 1993) ("Courts also should consider whether the majority shareholder's misconduct thwarts the minority shareholder's reasonable expectations of his or her role in the corporation."); *McCauley v. Tom McCauley & Son, Inc*., 724 P.2d 232, 237 (N.M. Ct. App. 1986) (reasonable expectations of minority shareholders should be respected); *In re Matter of Kemp & Beatley, Inc*., 473 N.E.2d 1173, 1179 (N.Y. 1984) (shareholder is oppressed when denied reasonable expectations); *Meiselman v. Meiselman*, 307 S.E.2d 551, 563-64 (N.C. 1983) (satisfying the reasonable expectations of the shareholders should be a guide to resolution of disputes).[9]

These two limitations cause Yokeno's breach of fiduciary duty claim to fail. First, the offending action—Lai's purchase of and execution upon the CSB judgment—does not bear the relation to Lai's status as a majority shareholder that is necessary to implicate Lai's fiduciary duties. Again, those duties govern only Lai's "actions *relative to the operations of the enterprise*." *Donahue*, 328 N.E.2d at 515 n.18 (emphasis added). Or, put differently, they govern only Lai's use of his "power to control corporate activities." *Ahmanson*, 460 P.2d at 471. The purchase of and execution upon the CSB judgment was not an action relative to the operations of FFBA; in fact, it had nothing to do with the operations of FFBA. Likewise, the purchase of and execution upon the CSB judgment is not rooted in, or otherwise connected to, Lai's power to control corporate

---

[9] These cases all involved a shareholder oppression statute, something not at play in this case. However, they are still relevant, insofar as they demonstrate widespread acceptance of the "reasonable expectations" inquiry in the context of shareholder disputes. Moreover, many commentators see little difference, in practice, between the analysis of (1) statutory oppression claims and (2) common-law breach of fiduciary duty claims. *See*, *e.g.*, 2 F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL'S CLOSE CORPORATIONS § 9.29) ("These three standards for determining oppression are not contradictory, as conduct that violates one of them may well also violate the others."); 2 O'NEAL & THOMPSON'S OPPRESSION § 7:13 (same); Steven C. Bahls, *Resolving Shareholder Dissension: Selection of the Appropriate Equitable Remedy*, 15 J. CORP. L. 285, 322 (1990) ("Although courts focusing on the majority's duty of utmost good faith and loyalty and courts focusing on the minority's reasonable expectations do take different approaches, in practice, there is little difference."). *See also Gimpel v. Bolstein*, 477 N.Y.S.2d 1014, 1019 (Sup. Ct. 1984) (observing that the various oppression formulations "will frequently be found to be equivalent").

activities. Lai did not cause FFBA to act in a manner that injured Yokeno, nor did he exploit any particular power he had, *as a majority shareholder*, in purchasing and executing upon the CSB judgment.[10] Since Lai's purchase of and execution upon the CSB judgment does not bear the relation to Lai's status as a majority shareholder that is necessary to implicate Lai's fiduciary duties, Yokeno cannot maintain his breach of fiduciary duty claim.

Second, even if the offending action *did* bear the relation to Lai's status as a majority shareholder that is necessary to implicate Lai's fiduciary duties, Yokeno cannot claim that his "reasonable expectations" were defeated or frustrated. The CSB judgment was for $2,497,369.93 in damages, plus interest and costs of suit. Yokeno did not appeal the CSB judgment; in fact, he did not even oppose the motion for summary judgment that gave rise to it.[11] CSB, or any other party that took its place as judgment creditor, could obtain a writ of execution for enforcement of the judgment. *See* 7 GUAM CODE ANN. § 23101. Yokeno did not undertake any legal process to obtain a stay of execution. *See id.* § 23102.

Instead, Yokeno (apparently) sat idly by and let his property—except for the exempt items and interests described in Section 23111 of Title 7 of the Guam Code Annotated—become subject to judicial sale.[12] Such sale was to commence with personal property (*see* 7 GUAM CODE ANN. § 23103(1)), which includes "[s]hares or interests in any corporation or company" (*see id.* § 23109). If the total value of all his property were *less than* $2,497,369.93, then, exemptions aside, Yokeno

---

[10] Yokeno states that Lai's knowledge of the CSB judgment derives from his "business *and personal relationships* with . . . Plaintiff." Docket No. 7, Exh. B at ¶ 32 (emphasis added). This is not sufficient to suggest that Lai's purchase and execution of the CSB judgment was "relative to the operations of the enterprise."

[11] The court notes that Yokeno did not oppose the CSB motion, and did not appeal the CSB judgment, to emphasize his lack of diligence. These factors do not really bear on the "reasonable expectations" analysis. After all, even if Yokeno *had* opposed the motion for summary judgment but lost, and *had* appealed the judgment, but lost on appeal, he *still* would have no reasonable expectation of continued property rights in his property; a judgment is not any less valid for having been resisted by the party it is rendered against.

[12] Yokeno admits as much. *See* Docket No. 7, Exh. B at ¶ 31 ("Because Plaintiff was personally liable under the CSB Guaranty, his financial interests in other businesses, including FFBA and [PSI] and any real property interests, including his interests in Fai Fai Beach, became subject to levy and execution.")

cannot be said to have *reasonably* had an ownership interest in *any* of his property. And if the total value of all his property was *more than* $2,497,369.93, then Yokeno should have identified the pieces of property that he would sell, and whose value was sufficient, and then have instructed the marshal to levy upon those pieces only. *See* 7 GUAM CODE ANN. § 23112.

In short, after having a judgment for $2,497,369.93 entered against him and doing nothing to stay the execution of that judgment, Yokeno should have expected that at least some, if not all, of his property interests would be disturbed or extinguished. And having failed to instruct the marshal not to levy upon his shares in FFBA, he cannot reasonably have expected that his interests in those particular pieces of property would not be extinguished. Thus, since he cannot claim that his "reasonable expectations" of stock ownership were defeated or frustrated, Yokeno cannot maintain his breach of fiduciary duty claim or any of the other claims as they are dependent upon a finding of a breach of fiduciary duty.

## VI. CONCLUSION

All of Yokeno's claims depend upon the theory that Lai owed him fiduciary duties, and that Lai breached those duties when he purchased and executed the CSB judgment. For the reasons discussed in the foregoing, the court finds, as a matter of law, that Lai did not breach any fiduciary duties he may have owed to Yokeno when he purchased and executed the CSB judgment. Thus, Yokeno's breach of fiduciary duty claim fails. And since that claim fails, all his other claims also fail because they are predicated upon a breach. Accordingly, the court hereby **GRANTS** the Motion in its entirety.[13]

**SO ORDERED.**



/s/ Frances M. Tydingco-Gatewood
Chief Judge
Dated: Aug 19, 2011

---

[13] At the hearing on the Motion, Defendants objected to Yokeno's Rule 56(f) Declaration (Dkt. No. 73) and requested that the court strike additional portions of the record pursuant to the Order granting the Motion for Reconsideration. In light of the instant ruling, the court finds that the objection and requests are moot.